Thank you, Judge O'Scanlan. May it please the Court, I'm Derek Schaeffer from the Stanford Constitutional Law Center, appearing on behalf of plaintiff appellant Mr. Shakur. I'd respectfully ask to reserve two minutes of time for rebuttal. If I do so, just watch the clock. Thank you, Your Honor. Your Honors, Mr. Shakur is being put to an impossible choice between his health and his faith. Even his fellow inmates, who are similarly situated, receive the very accommodation that would solve his dilemma completely. Mr. Shakur here seeks simply the kosher meals that comply with his views of Islam, no less than they do with the religious views of fellow inmates who receive such meals as a matter of course. The ADOC's sole reason for denying him this accommodation is that Mr. Shakur, irrespective of his personal beliefs, subscribes to the wrong organized religion, Your Honors. You see, as ADOC told Mr. Shakur, its kosher meat is, quote, for Jews only, close quote. The upshot is that Mr. Shakur now confronts the dilemma of either converting to Judaism in order to obtain kosher meat, eating the regular meat that is prohibited by his faith, or eating vegetarian meals that compromise both his medical condition and his ability to engage in religious observance across the board. Counsel, can you help the Court with your understanding of the significance of the word halal? What does halal mean, and to what extent is it identical to or differentiated from kosher? Well, Your Honor, this is a question that there's some dispute about in the record. I think that the simplest definition of, or at least in the briefs there's some dispute about, the simplest definition of halal is that which is permitted under Islam. And that is distinct from haram, which is prohibited under Islam in terms of the consumption of meat. Now, Mr. Shakur, citing and quoting from the Koran itself, says that kosher meat, the meat or the food of the people of the book, is necessarily halal. And there is, that is an acknowledged view of Islam. It's not necessarily a uniform view of Islam, but it is an acknowledged view of Islam to which Mr. Shakur subscribes. Well, one of the problems we have here is we don't want to delegate to the warden of the prison an interpretation of the Koran. We have to be able to allow the prison to function on a reasonably operative basis. And I wonder whether you've been able to talk to your client about what would meet the definition so far as your client is concerned and presumably a large number of practicing Muslims. Well, I can't speak to the large number, Your Honor. I believe on this record, in fact, the indications are that it would not be a large number of Islamic inmates who would subscribe to Mr. Shakur's view that kosher meat does indeed constitute halal. But speaking specifically for Mr. — and indeed, that's what the ADOC's authorities seem to point to, is that mainstream Islam or the majority prevailing view of Islam is that kosher meat does not qualify as halal. Notwithstanding that, Mr. Shakur's view, shared by some number of other Muslims, is that indeed kosher meat does qualify as halal. So what is the legal standard that we're supposed to look to? Are we supposed to just look to his beliefs and reevaluate his sincerity, or are we supposed to make a general analysis of the Islam religion and make a determination based on that? Certainly the former, Your Honor. As we understand the Supreme Court's instruction judge board law, and it seems quite consistent, really the inquiry at the threshold is twofold. Number one, is the belief sincerely held by the individual in question, Mr. Shakur? Here, there's no dispute about that. We don't understand the ADOC any place to be questioning the sincerity of Mr. Shakur's personal view. And then second of all, is the belief religious in nature? And again, we don't understand there to be any dispute about that. This is consistent with and it follows from Mr. Shakur's view of — views of the religion of Islam. Notwithstanding that, doesn't the prison policy, the correctional policy have to be filtered through the Taylor test? Yes. Yes, Judge Hopkins. And isn't it your burden to prove that the regulation is unreasonable? That it substantially burdens the religious views in question, exercise of the religious views in question. And one of the things I understand from your brief is that providing your client with the requested diet would not be an economic burden on the Arizona Department of Corrections, is that correct? Well, yes, Your Honor, but that's in tandem with other arguments. So at the threshold — I want to focus on that, if I can, just for a moment. Sure. What proof did you offer that it would not be economically or otherwise burdensome on the department to exceed your client's request? Well, and the first point, Judge Hopkins, is that the rationale in question, the cost rationale, doesn't match up with the burden in question. The burden specifically is denying, and this is returning to your question, Judge Oskaman, kosher meat would satisfy Mr. Shakur and his views of Islam. And so, Judge Hopkins, all of the proof that's been offered by the prison goes to what would happen if 850 Islamic inmates were to be provided the same kosher meals. That seems a non sequitur, because there's been no showing by the prison that, indeed, accommodating Mr. Shakur alone based upon his specific circumstances and beliefs would necessarily result in the same accommodation for all Islamic inmates or even that they would seek that accommodation. But beyond that, Judge Hopkins, Mr. Shakur, pro se below, did, of course, contest the sufficiency of the rationale proffered by the ADOC. And as we know — I'm trying to get the dominoes, from my point of view, in the correct order. It's your burden to meet the four prongs of the Taylor test, correct? Of the Turner test, that's correct, Your Honor, but not under RLUIPA. So if we're talking about the free exercise clause of the Constitution, yes, it is our burden. Under RLUIPA, under the statutory inquiry, it is, in fact, the ADOC's burden to show that it is — it has arrived at the least restrictive alternative for pursuing its compelling interest. Okay. But did your client put any evidence in the record as concerning the cost or difficulty of providing this diet? Your Honor, I think all that that would consist of is basically deposing the individuals who signed the affidavit. There was a pastor for the prison who said that his understanding of the cost of kosher meal were such that the kosher meals were such that if you multiplied that by the additional number of Islamic inmates, you would arrive at the ADOC's cost estimate. But, Judge Hopkins, we believe that as a matter of law, cost in and of itself, untethered to anything more, is an insufficient rationale. And certainly, it's an insufficient rationale for deciding that a certain benefit will be provided to one religion, whereas other disfavored religions are not entitled to the same benefit, even where the cost of accommodating their religious beliefs would be no greater. That is, so there's an Establishment Clause issue quite distinct, and an equal protection issue, we believe, quite distinct from the free exercise clause and RLUIPA issues that we're talking about under the rubric of partnering. Robertson argued in the district court? We believe that Mr. Shakur's complaint on its face stated a claim under the Establishment Clause, but even if it did not, Your Honor, we believe that the Establishment Clause principles and jurisprudence informs the equal protection inquiry, as courts have pointed out. I guess my question is, was it distinctly argued? Well, Your Honor, we believe that under the liberal standard that governs construction of a pro se prisoner's complaint, it was sufficiently articulated. I do not believe that it was argued in the way that we, as Mr. Shakur's counsel, were we to be his counsel, would state the argument for the district court's benefit. Counsel, are there any other claims arising out of the Arizona system which raise similar issues, or are we dealing just with one adherent to the Muslim faith out of 850 in the system? Well, Your Honor, I can't speak to that with confidence, Judge O'Scanlan. I can say that I think this record is such that Mr. Shakur's claim is unique to him, both in terms of his beliefs and also in terms of his circumstances, that is, his medical condition and the negative ramifications of consuming the vegetarian diet that he demonstrated on the record. Would you indicate what other kinds of diets other than kosher might be requested to meet the halal standard? We do know that Mr. Shakur has sampled two different diets, one being the lacto-vegetarian diet and the other being the ovo-lacto-vegetarian diet. And both of those, right now it's the ovo-lacto-vegetarian diet that seems to be the prevailing one for the ADOC. And we know that that has proved detrimental to Mr. Shakur, both in terms of his ability to exercise his faith and in terms of his medical condition. Counsel, you indicated you might want to reserve some time. You may do so if you wish. Thank you, Your Honor. We appreciate that. If the Court doesn't have any further questions at this time, we would respectfully reserve the balance of our time. You may do so, counsel. We'll hear from the State. Thank you, Judge O'Scanlan. My name is Kathy Stewart, and I represent prison officials at the Arizona Department of Corrections. I assume that Nora Shiro is still the superintendent, the director of the department? Yes, she is, as a matter of fact. The caption reflects Terry Stewart. He hasn't been the director for some time, right? That's absolutely true. Would you provide that name to the clerk as you leave the courtroom? Yes, I will, Your Honor. Thank you. And there's no relation between Mr. Stewart and myself. I represent the prison officials who were responsible for applying the set of policies established to accommodate religious exercise of inmates, as we know is recognized under the Constitution and an entire body of case law as being an obligation of prison authorities. What surprises me about the actions of the warden of the State is that the kosher meal was denied. What was the theory under which the warden denied kosher meal to this individual? Your Honor, that's a good question. And really what we have here is an inmate's expressed preference to be provided with a portion of a menu designed to accommodate the dietary laws of Judaism, which is known as keeping kosher. And he's done it not because it's required by his religion, but merely because it doesn't violate his religion. Well, you make that statement that it's not required by his religion, but aren't you second-guessing his sincere belief that he believes that the kosher meal will satisfy the requirements of his religion? And who are we as judges to sit here and say that, no, it's not a central tenet or it doesn't satisfy? And who's the warden to say that? This is his belief. This is how he can fulfill his religion. It's important, Your Honor, to distinguish between his belief that it would be consistent, that halal is permitted, and many things are permitted. It's not mandated. In other words, what the authority forbids is some sort of infringement on exercise that either forces an inmate or religious adherent to violate a forbidden aspect of the religion or prevents them from complying with the dietary law. The laws of Judaism include the notion of keeping kosher. That diet was not designed to be... Can we have somewhat of a circuit conflict on that question as to whether or not the religious belief has to be a central tenet or mandated by the religion, or whether it's simply the person, the inmate must just assert it as his sincere belief? I don't think that there's a dispute about that. It's under RLUIPA. That isn't a relevant consideration. It just needs to be a religious exercise. And Mr. Shakur's counsel is correct when he says that it does what's required is that it's a religious belief and his sincerity. But that's not really what's at issue here. That's the – to uphold the trial court in this case, the court does not need to question the sincerity of his belief that kosher meat would be permitted. And it doesn't have to choose between those conflicting authorities about whether halal is kosher or not. But I thought the warden denied the kosher request. Your Honor, they denied the request because it was not a requirement of his religion. Okay. Well, that's where, obviously, we have the problem. And it does bother me, just speaking as an individual, that we would place upon the theological analysis. It just doesn't seem to be something that we ought to be able to impose. Can you help us with something a little less complex that would give guidance to the warden, at the same time accommodate the sincere religious beliefs of an inmate? I'm trying, Your Honor. And I think the problem here is that Mr. Shakur nowhere has suggested that this is a requirement of his religion. But why should that be the test? Why should that be the test? Why don't we just look at it in terms of his sincere belief that this would accommodate his religious practice? Your Honor, because then we would stand the deference to prison authorities essentially on its head. If an inmate was allowed to pick and choose amongst the religions, those things that are consistent with his beliefs, but are more to his liking, in this case, he would prefer not to be a vegetarian. He would prefer to eat meat. Well, what's the penological interest at stake here? Why would the penological policies be adversely affected if this individual were allowed to have a kosher meal? I have exactly the same question as you answer it. I have exactly the same question. And that is an excellent question. The penological interest as demonstrated and not rebutted anywhere in the record is that if, in fact, this is a mandate of the religion, we would have to provide it to 850, and actually we're here a couple of years after that estimate, so many more than that in terms of Muslim inmates. And there's no question that that would be burdensome, at a minimum $1.5 million. And if it was actually a provision of halal meat, it would be many millions of dollars. And that's not disputed anywhere in the record. Secondly, the ---- Well, before you leave that first one, you seem to have a notion of what halal meat means. I asked opposing counsel, and I got kind of a theological description. What do you understand halal meat to mean? Literally, and I believe the majority position has indicated there is a majority view, would be that it is meat that at the time of sacrifice has the name of Allah pronounced over it. And I believe there are a number of other requirements as well. But, again, Mr. Shakur's sincere belief that kosher is an okay substitute or an acceptable substitute is really what is at the heart of the matter here. And the problem, and this is the other aspect of the penological interest being served here, is that if it's not a requirement of its religion and, therefore, the Department isn't forcing him to violate a tenant of his religion by providing a vegetarian meal or prohibiting him from complying with a dietary law, then it would be imposing this burden on the Department to assess every inmate's suggestion that his own personal belief requires that he be provided with something that doesn't violate his religion. You know, that falls right into his as-applied challenge. What's the Department's response to his position, which he did argue below, that the vegetarian diet affects his medical condition? With respect to that, Your Honor, first of all, there is no medical record concerning it being a medical condition. It certainly is something he describes as being uncomfortable. It's a normal bodily function. Some portion of it is not. Why does he have to have a medical record? I mean, it's he's describing it. He testified to it. He made a declaration as to it. And it's just, it's entitled to just as much weight as the declaration that allowing Mr. Shakur to have this kind of a meal will ultimately cost the prison $1.5 million or something. Well, if in fact it is a medical condition, in other words, some portion of flatulence, a normal bodily function, is actually being caused by the vegetarian diet and would be relieved, so to speak, by adding a meat portion selected from the kosher diet designed to abide by dietary laws of Judaism, then that is something to be resolved by the medical authorities in the prison as to whether there is a least burdensome or something at a de minimis cost that could address that. Here we have a request that the entire policy either be thrown aside or that the Department be required to evaluate every individual inmate's food preference in terms of what he'd prefer to have as long as it's consistent with his religious beliefs and would make him more comfortable. That's what we have here, is Mr. Shakur is indicating that the Department's is in compliance with his religious belief. There's no question that the vegetarian diet does not violate the tenets of Muslim. What he wants is to add a meat portion from the kosher diet because he would prefer to eat meat because it is consistent with his beliefs. What's the difference? I don't understand the difference between those two categories. The vegetarian doesn't violate, the kosher doesn't violate, so why don't you give him the kosher? First of all, the kosher diet was not designed to ensure that Jewish inmates obtained meat. It was designed to comply with those Jewish inmates wishing to keep kosher. And that's an entire – it doesn't just relate to the provision of kosher meat. Suppose you had a prison with an A wing and a B wing with a central food processing plant, preparation plant, and there was a diet for building A and a diet for building B, and an Islamic inmate in building B said the diet you're providing me violates my religious beliefs, but the diet you provide for building A does not. May I have that diet? How would we analyze that? Well, I think it's very similar to what Mr. Shakur was saying.  It's another diet. It's at the institution. It's provided to other inmates. And this individual says the diet you have given me affects me personally, medically, and violates my religion, but that that you're providing right next door does not. May I have that? What's the penological interest in denying the request? Well, Your Honor, I think that that's highly illustrative of why there is a relaxed test for evaluating these kinds of religious exercise claims. It's because there should be deference provided to the prison in dealing with 30,000 inmates and various faith groups within that group being accommodated with respect to their religious dietary beliefs. I thought that's what RILUPA was all about. RILUPA is specifically about not allowing infringement of the religious beliefs this Court has even recognized the difference between curtailing an exercise of the religion as opposed to forcing someone to violate the tenets of their religion. And what's most important for this Court is that no court who's considered this issue, and several have, have determined that it is a substantial burden to inmates to not provide halal or kosher meat. Not a single court has done that, and several have found that it is not required and it is not a substantial burden. But we don't have the halal issue before us in this case, do we? Well, we do in the sense that that's what Mr. Shakur essentially claimed is a part of his religious belief. But that's not what he asked for. He specifically asked for a kosher category, which you make available to at least 150 other inmates. Actually, there are 150 inmates. Not all of the Jewish inmates request kosher. But the ‑‑ But if it's readily available in terms of the prison kitchen and that sort of thing. Right. It is certainly more costly, and it is either ‑‑ if it's required by the institution, then they would have to provide it to all of the Muslim inmates. If not, it would impose this burden on the prison to deal with these individualized complaints and a diet preference. All right. We understand your position. Thank you, counsel. Mr. Schaffer, you have some reserved time. Thank you, Judge O'Scanlan, and may it please the Court, if I could start at the end of Ms. Stewart's colloquy with the Court. She indicated that no court had upheld a claim such as Mr. Shakur's. In fact, Your Honor, we know of no case that is akin to this case, in so much as you have an Islamic prisoner who is requesting nothing more than the existing diet already furnished by the prison to other inmates and has demonstrated specific medical and religious burdens demonstrably that are associated with prior consumption of the vegetarian diet. We know of no such case. And indeed, the Luckett case, an Arizona district court decision that was cited both by the court below and by the ADOC here, is one in which a non‑Jewish prisoner was requesting a kosher diet. And on the merits, in the context of a preliminary injunction, that district court said, indeed, the prison would be required to accommodate that inmate based upon his demonstrated sincere religious belief that kosher meat would accommodate or kosher meals would accommodate his diet. Counsel, is there anything you can say in the presence of the Attorney General's to assuage their concern that a decision in this case is going to mean that they're going to have to provide 850 additional kosher meals in the system? Your Honor, I think there are two things that I can point to. One is the ADOC's briefing on this point. As far as what Islamic authorities are understood to say generally, as far as that instruction is understood by most Muslims out there in the world and presumably in the prison as well. But the second, Your Honor, to the extent that this is not a self‑limiting request, we believe the ADOC would be perfectly within its rights to say there needs to be both a demonstration, perhaps, of the sincerity of the belief and of some special circumstance as to why the vegetarian diet is inadequate as a medical and or a religious matter for a particular inmate. Mr. Shakur has done that, Judge O'Scanlan, in a way that I have no reason to think more than a few inmates, if any, within the ADOC could. So that, it seems to us, is perfectly within the ADOC's control as far as how it couches any accommodation for Mr. Shakur. I also want, Your Honors, to focus a little bit on the equal protection and establishment clause inquiry, because Ms. Stewart's account is that it's a different matter if the religion requires consumption of a particular sort of diet or particular sort of meat. And she says, here Mr. Shakur has not shown that. We certainly take issue with that account. But what we want to point out to the Court is that here it is undisputed, Your Honors, that Jewish inmates no more require kosher meat than Mr. Shakur does. In fact, the ADOC's kosher diet consists of two vegetarian meals out of three, and then a third meal that adds kosher meat. There's no claim that the vegetarian diet is in any way inconsistent with Judaism. By definition, the ADOC is taking the position that it is indeed consistent with Judaism. So Jews, Jewish inmates within the prison are receiving special meat, special accommodations above and beyond what they are compelled to do. And Mr. Shakur, although he, too, shares the faith such that that kosher meat would be perfectly appropriate for him, and although he also suffers demonstrably from the vegetarian diet in a way that we have no reason to think any Jewish inmates who are receiving the kosher meat does, he is somehow being excluded from that accommodation simply because he belongs to the wrong faith. And that seems to be a classic establishment clause. Thank you, Counsel. Your time has expired. Thank you, Justice Kennedy. The case just argued will be submitted for decision, and the Court would like to express the appreciation of the Court to Dean Sullivan and to the members of the Stanford Law School group that accepted this representation on a pro bono basis. Thank you very much. Thank you, Your Honor.
judges: O'scannlain,hawkins,wardlaw